66 A.3d 1093

**Lori A. ROBINETTE, et al.**

v.

**Luan HUNSECKER.**

No. 2444, Sept. Term, 2011.

Court of Special Appeals of Maryland.

May 29, 2013.

78

Peter D. Fitzpatrick (The Stern Group, on the brief), Frederick, MD, for Appellant.

Brian E. Barkley (Barkley & Kennedy, Chartered, on the brief), Rockville, MD, for Appellee.

Panel: MEREDITH, KEHOE, HOTTEN, JJ.

HOTTEN, J.

"The alphabet soup world of pension benefits has spawned a dizzying array of acronyms, like ERISA, QDRO, and QPSA, and a complex web of interrelated statutory provisions" that collide at the intersection of federal statutes with State domestic relations law. *Hamilton v. Wash. State Plumbing and Pipefitting Indus. Pension Plan*, 433 F.3d 1091 (9th Cir.2006). In this case of first impression, we are asked to resolve contentions relating to the entry of a domestic relations order and the existence of an equitable remedy in the form of a

constructive trust when a party to a divorce fails to obtain a qualified domestic relations order prior to the pre-retirement death of a former spouse, when that former spouse remarries and—prior to pre-retirement death—designates his or her surviving spouse as sole beneficiary of his/her pension.

Lori A. Robinette, appellant, appeals from the judgment of the Circuit Court for Frederick County granting summary judgment and awarding a constructive trust and partial pension benefits to her deceased husband's former spouse, Luan Hunsecker, appellee.

On appeal, appellant presents two questions for our review: [1]

I. Did the circuit court err by entering an order for the alienation of pension benefits after the death of the plan participant?

II. Did the circuit court err by creating a constructive trust to alienate pension benefits after the death of the plan participant?

For the reasons outlined below, we answer both questions in the negative, and affirm the judgment of the circuit court.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The essential facts pertinent to this appeal are undisputed. On June 6, 1981, appellee, Luan Hunsecker ("Ms.Hunsecker"), was married to the decedent, Roger Robinette ("Mr.Robinette"). During their marriage, Mr. Robinette was employed by Montgomery County Public Schools ("MCPS") and a par-

---

1.  In her brief, Ms. Robinette framed the issues for us as follows:
    I.  DID THE CIRCUIT COURT ERR BY ENTERING AN ORDER FOR THE ALIENATION OF ERISA QUALIFIED PENSION BENE-FITS AFTER THE DEATH OF THE PLAN PARTICIPANT?
    II.  DID THE CIRCUIT COURT ERR BY CREATING A CONSTRUC-TIVE TRUST TO ALIENATE ERISA QUALIFIED PENSION BENE-FITS AFTER THE DEATH OF THE PLAN PARTICIPANT?
    See Part III(A)(1), infra, for an explanation of our alteration of the above-presented questions.

ticipant in its pension plan. After nearly seventeen years of marriage, Ms. Hunsecker and Mr. Robinette executed a voluntary separation agreement on April 16, 1998. Pursuant to that agreement, Ms. Hunsecker transferred and assigned all her rights, title, and interest in the marital home, with the proviso that the proceeds of any sale would be the "sole and exclusive property" of Mr. Robinette. In addition, Ms. Hunsecker further conveyed all her rights, title, and interest in a boat and trailer the couple owned, and she released and discharged any claims for *pendente lite* and indefinite alimony. Following their agreement, a judgment of divorce was entered by the Circuit Court for Frederick County, Maryland, providing that the terms of the voluntary separation agreement would be incorporated, but not merged, into the judgment of absolute divorce.

Most notably, paragraph eight of the separation agreement provided that the judgment of divorce, issued on August 3, 1998, would serve as a qualified domestic relations order ("QDRO") in the pension benefits and death ("surviving spouse") benefits provided to Mr. Robinette through his employ with MCPS.[2] Specifically, the provision stated:

*PENSION:* [Mr. Robinette] is a participant in a pension plan through his employment with [MCPS]. The parties agree that [Ms. Hunsecker] shall be the alternate payee of the aforesaid pension and that the parties' judgment of divorce shall be a Qualified Domestic Relations Order as defined by the Retirement Equity Act of 1984, as from time to time amended. [Ms. Hunsecker's] equitable interest in [Mr. Robinette's] pension is hereby declared to be fifty percent (50%) of the "marital share" of said pension benefit,

---

**2.** A qualified domestic relations order, or QDRO, is a subset of domestic relations orders that recognizes the right of an alternate payee to receive all or a portion of the benefits payable with respect to a pension plan's participant under the respective pension plan. *Eller v. Bolton,* 168 Md.App. 96, 107, 895 A.2d 382 (2006) (relying on 29 U.S.C. § 1056 *(d)(3)(B)(i)).* *See* Part III(A)(2), *infra,* for further discussion and analysis pertaining to the particularized characteristics of a QDRO, its exceptions to ERISA's anti-alienation provision, and the limitations to its issuance posthumously.

the marital share being that fraction of the benefit whose numerator shall be the number of months of the parties' marriage during which the benefits were accumulated, which number shall be determined as of the date of this Agreement, and whose denominator shall be the total number of months during which the benefits were accumulated prior to the time when payment of such benefits shall commence. [Ms. Hunsecker] shall receive fifty percent (50%) of the aforesaid marital share of any benefits made from the pension to [Mr. Robinette], including any death benefits if, as and when such payments are made.

(emphasis in original). This provision, however, was never enrolled in a QDRO.

After their divorce, Mr. Robinette continued working for MCPS. He remarried on June 25, 2000, to Lori A. Robinette ("Ms.Robinette"). Throughout their nine years of marriage, Mr. Robinette continued working for MCPS until his untimely death on October 2, 2009. Ms. Robinette was named as the personal representative of Mr. Robinette's small estate, which she administered without publication.

Upon learning of Mr. Robinette's passing, Ms. Hunsecker attempted to obtain a portion of the pension benefits from MCPS on May 12, 2010, pursuant to the separation agreement that she had entered eleven years earlier. Her efforts proved unsuccessful because MCPS had never received a QDRO to indicate Ms. Hunsecker as the partial beneficiary of Mr. Robinette's pension benefits. Mr. Robinette had named Ms. Robinette the beneficiary of record with MCPS on September 2, 2003. As a consequence, Ms. Hunsecker was denied any portion of the pension benefits, and she was apprised that Mr. Robinette's pension was being paid to Ms. Robinette.

Thereafter, Ms. Hunsecker instituted a cause of action in the Circuit Court for Frederick County, Maryland, against Ms. Robinette on January 20, 2011, seeking the establishment of a constructive trust on grounds of Ms. Robinette's unjust enrichment. The parties filed a joint stipulation of facts on October 14, 2011. On that same day, Ms. Hunsecker addition-

ally moved for summary judgment, arguing that she had a superior equitable title to Mr. Robinette's pension.

Ms. Robinette responded in opposition on November 3, 2011, filing her own motion for summary judgment, arguing three points. First, Ms. Robinette attested that Ms. Hunsecker had failed to obtain a QDRO prior to Mr. Robinette's death, and, as a consequence was precluded from asserting any interest to Mr. Robinette's pension pursuant to Title I of ERISA. Second, she argued that Ms. Hunsecker's claim of unjust enrichment was inapplicable because the parties "have no privity whatsoever, whether contractual or quasi-contractual." Third, Ms. Robinette argued that the creation of a constructive trust was an improper method of acquisition of Mr. Robinette's pension and that she maintained higher equitable call.

After hearing argument of counsel on November 17, 2011, and taking each parties' motions *sub curia,* the circuit court entered summary judgment in favor of Ms. Hunsecker on January 4, 2012, granting her a constructive trust in a portion of Mr. Robinette's pension and death benefits and further ordered the issuance of a posthumous QDRO, consistent with the separation agreement.

Ms. Robinette subsequently noted her timely appeal to this Court.

## II.

## STANDARD OF REVIEW

Md. Rule 2–501(f) provides that a trial court "shall enter [summary] judgment in favor or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." We review a trial court's grant or denial of summary judgment *de novo* by conducting our own independent review of the record and deciding the same legal issues as the trial court. *Haas v. Lockheed Martin Corp.,* 396 Md. 469, 478–79,

914 A.2d 735 (2007). When, as in this case, there are no disputed facts related to the trial court's grant or denial of summary judgment, our only task is to determine whether the trial court's decision was legally correct. *Id.* at 479, 914 A.2d 735. *See also Gonsalves v. Bingel,* 194 Md.App. 695, 708, 5 A.3d 768 (2010).

## III.

## DISCUSSION

### (A) DID THE CIRCUIT COURT ERR BY ENTERING A DOMESTIC RELATIONS ORDER FOR THE ALIENATION OF PENSION BENEFITS AFTER THE DEATH OF THE PLAN PARTICIPANT?

Ms. Robinette first contends that the circuit court erred by entering a domestic relations order for the alienation of pension benefits that had already vested in the pre-retirement pension plan participant's designee upon the death of the pension plan's participant. In response, Ms. Hunsecker argues that "[t]he [c]ourt could ... enter a QDRO since Mr. Robinette was a participant in the MCPS Retirement Plan, a governmental retirement plan that is exempt from the provisions of 'ERISA.' " We find Ms. Hunsecker's argument more persuasive.

In considering Ms. Robinette's first assignment of error, we preliminarily begin with an overview of the applicability—or, in this case, the inapplicability—of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (1999) ("ERISA"), to pension plans. *See, e.g., Potts v. Potts,* 142 Md.App. 448, 454–55, 790 A.2d 703 (2002). ERISA was first enacted in 1974 in order to remedy long-standing abuses and deficiencies in the private pension system. *See generally* H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in,* 1974 U.S.Code Cong. & Ad. News 4639. *See also* 29 U.S.C. § 1001 *et seq.* "These deficiencies included inadequate vesting provisions, insufficient assets to assure payment of future benefit obligations, and premature termination of under-funded benefit plans." *Rose v. Long Island R.R. Pension Plan,* 828 F.2d 910, 913 (2d Cir.1987) (citations omitted). Thus, ERISA's

purpose is to "to provide better protection for beneficiaries of employee pension and welfare benefit plans abounding in the **private** workplace." *Rohrbeck v. Rohrbeck,* 318 Md. 28, 30, 566 A.2d 767 (1989) (discussing the history and intent of ERISA) (emphasis added), *quoted in Eller v. Bolton,* 168 Md.App. 96, 106–107, 895 A.2d 382 (2006). *See also* Albert Feuer, *WHO IS ENTITLED TO SURVIVOR BENEFITS FROM ERISA PLANS?,* 40 J. MARSHALL L.REV. 919, 923 (2007) ("ERISA was a response to the protests on behalf of many employees and their beneficiaries who had been deprived of anticipated pension and welfare benefits.").

ERISA is comprised of four titles. Title I of ERISA, 29 U.S.C., § 1001 *et seq.,* contains various substantive and procedural requirements with which covered plans must comply. These include standards for vesting, funding and fiduciary responsibility as well as the survivorship provisions and anti-alienation provisions under which Ms. Robinette *initially* claimed as her sole right to Mr. Robinette's pension and death benefits. Title II of ERISA is codified in the Internal Revenue Code, 26 U.S.C. § 401 *et seq.,* and contains requirements pertaining to the qualifications of pension plans for favorable tax treatment. Title III, 29 U.S.C. § 1201 et seq., establishes ERISA's administrative and enforcement provisions. Title IV, 29 U.S.C. § 1301 et seq., contains the Pension Benefit Guaranty Corporation ("PBGC"), guaranteeing the payments of benefits by plans which terminate with insufficient assets to pay those benefits to their participants and designees.

Under Title I, it is well settled that a core ERISA concern is the "ERISA command" that pension plans subject to ERISA's provisions make payments to the beneficiary who is "designated by a participant or by the terms of [the] plan." *Egelhoff v. Egelhoff,* 532 U.S. 141, 147, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001); *Morales v. Trans World Airlines Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). *See Rohrbeck,* 318 Md. at 30, 566 A.2d 767; *Eller,* 168 Md.App. at 106–07, 895 A.2d 382. In fact, ERISA § 205, 29 U.S.C. § 1055—the spousal survivor provision—mandates that pension benefit plans provide spouses with specified survivor

benefits. *See id.* § 1055(b)(1)(A). Thus, such benefits and benefit designations must be part of all covered ERISA-governed pension plans. *See id. See also* Feuer, *supra,* 40 J. MARSHALL L.REV. at 655. In addition, Section 1055 provides two specific avenues through which surviving spouses may attain a portion of the participants' pension benefits. *Id.* § 1055(d) & (e).[3] These two avenues depend on the status of the participant before the date on which the annuity begins. *Id.* § 1055(a).

Specifically, "in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity[.[4]]" *Id.* § 1055(a)(1). In the alternative, if "a vested participant ... dies before the annuity starting date and ... has a surviving spouse, a qualified preretirement survivor annuity [5] shall be provided to the surviving spouse of such participant." *Id.* § 1055(a)(2).

---

3. *See* notes 13 and 14, *infra.*

4. A qualified joint and survivor annuity ("QJSA") means an annuity
    (A) for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant and the spouse, and
    (B) which is the actuarial equivalent of a single annuity for the life of the participant.
   29 U.S.C. § 1055(d)(1).

5. A qualified preretirement survivor annuity ("QPSA") means a survivor annuity for the life of the surviving spouse of the participant if
    (A) the payments to the surviving spouse under such annuity are not less than the amounts which would be payable as a survivor annuity under the qualified joint and survivor annuity under the plan (or the actuarial equivalent thereof) if—
    (i) in the case of the participant who dies after the date on which the participant attained the earliest retirement age, such participant had retired with an immediate qualified joint and survivor annuity on the day before the participant's date of death, or
    (ii) in the case of the participant who dies on or before the date on which the participant would have attained the earliest retirement age, such participant had—
    (I) separated from the service on the date of death,
    (II) survived to the earliest retirement age,

To be sure, a participant's former spouse *may* be treated as a beneficiary under the plan and additionally regarded as a surviving spouse, eligible to receive surviving spouse benefits. *See* 29 U.S.C. § 1055(f)(2).[6] Nonetheless, this designation can *only* occur when no conflict of law arises between a State's domestic relations law and ERISA's preemption clause or general anti-alienation provision. *See* 29 U.S.C. § 1144(a) (stating that ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan"); 29 U.S.C. § 1056(d)(1) (providing that "[e]ach pension plan shall provide that benefit[s] under the plan may not be assigned or alienated."). To clarify the intersection of state domestic relations law with ERISA, and the potential conflict arising between these laws, Congress amended ERISA in 1984 through its enactment of the Retirement Equity Act (P.L. 98–397, 98 Stat. 1433) ("REA") to improve the delivery of

> ... retirement benefits and **provide for greater equity under private pension plans for workers and their spouses and dependents** by taking into account changes in work patterns, the status of marriage as an economic partnership, and the substantial contribution to that partnership of spouses who work both in and outside the home, and for other purposes.

---

(III) retired with an immediate qualified joint and survivor annuity at the earliest retirement age, and

(IV) died on the day after the day on which such participant would have attained the earliest retirement age, and

(B) under the plan, the earliest period for which the surviving spouse may receive a payment under such annuity is not later than the month in which the participant would have attained the earliest retirement age under the plan. ...

*Id.* § 1055(e).

**6.** Section 1055(f)(2) provides satisfaction of the survivor benefits' marriage requirement to a former spouse of the pension plan participant if "the participant and the participant's spouse in such marriage have been married for at least a 1–year period ending on or before the date of the participant's death," and allows the "participant and spouse [to be] treated as having been married throughout the 1–year period ending on the participant's annuity starting date." *Id.* § 1055(f)(2).

Pub.L. No. 98–397; 98 Stat. 1426 (1984) (emphasis added). As a result, the REA provides the requisite clarification that state-court-ordered assignments of plan benefits to former spouses and dependents were permitted. *Tr. of Dr. Guild of America–Producer Pension Benefits Plans v. Tise,* 234 F.3d 415, 419 (9th Cir.2000) (citing Senate Judiciary Committee, S.Rep. No. 98–575 at 1 (1984), 1984 U.S.C.C.A.N. 2547) (other citations omitted); *Rivers v. Central and South West Corp.,* 186 F.3d 681, 683 (5th Cir.1999) (noting that the REA amended ERISA's marriage requirements to resolve contentions among the courts with regard to the application of the former surviving spouse provisions); *Eller,* 168 Md.App. at 107, 895 A.2d 382; *Potts,* 142 Md.App. at 455–56, 790 A.2d 703 (citations omitted). Nevertheless, REA's amendments to ERISA explicitly provide that the former spouse of the plan participant can only replace the participant's current spouse and be treated by the private pension plan as the surviving spouse pursuant to a QDRO. 29 U.S.C. § 1056(d)(3)(F).[7] *See Hopkins v. AT & T Global Information Solutions Co.,* 105 F.3d 153, 155 (1997).

A qualified domestic relations order, or QDRO, is a subset of domestic relations orders [8] that recognize the right of an

---

**7.** Section 1056(d)(3)(F) provides that

(F) [t]o the extent provided in any qualified domestic relations order—

(i) the former spouse of a participant shall be treated as a surviving spouse of such participant for purposes of section 205 [29 U.S.C. § 1055] (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes), and

(ii) if married for at least 1 year, the surviving former spouse shall be treated as meeting the requirements of section 205(f) [29 U.S.C. § 1055(f)].

**8.** The term "domestic relations order" means "any judgment, decree or order (including approval of a property settlement agreement) which" satisfies the following:

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including community property law).

29 U.S.C. § 1056(d)(B)(ii).

alternate payee to receive all or a portion of the benefits payable with respect to a pension plan's participant under the respective pension plan. *Eller*, 168 Md.App. at 107 (relying on 29 U.S.C. § 1056(d)(3)(B)(i)(I)). Section 1056(d) of ERISA sets the parameters by which a domestic relations order ("DRO") would be deemed "qualified," specifically providing:

> (C) A domestic relations order meets the requirements of [a QDRO] only if such order clearly specifies—
>
> (i) the name and last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
>
> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined.
>
> (iii) the number of payments or period to which such order applies and
>
> (iv) each plan to which such order applies.

*Id.* § 1056(d)(3)(C).

Section 1056(d)(3)(D) prohibits qualification of a domestic relations order that "require[s] a plan to provide any type or form of benefit ... not otherwise provided under the plan," "require[s] the plan to provide increased benefits (determined on the basis of actuarial value)," or "require[s] the payment of benefits to an alternate payee which [is] required to be paid to another alternate payee under another order previously determined to be a [QDRO]." 29 U.S.C. § 1056(d)(3)(D) *et seq.* Admittedly, Maryland has not previously addressed the meaning of this section within the context of an alternate payee seeking a participant's pre-retirement death benefits posthumously. *But see Eller*, 168 Md.App. at 132–33, 895 A.2d 382 (concluding that "[b]ecause a *nunc pro tunc* amendment of the QDRO relates back to the time prior to the [former spouse's] death ... [the *nunc pro tunc* amendment of the QDRO] will not fail for naming [former spouse] as the alternate payee, even though she is now deceased[,]" as a method to provide benefits to the former spouse's estate). Like *Eller*, however,

we turn our attention to the United States Circuit Courts of Appeal to engage in a discussion of some key cases to determine the permissibility of posthumous QDROs. *See, e.g., Eller,* 168 Md.App. at 119, 895 A.2d 382.

The United States Circuit Court of Appeals for the Third Circuit first considered the permissibility of posthumously issued QDROs in *Samaroo v. Samaroo,* 193 F.3d 185 (3d Cir.1999). There, Louise Robichaud–Samaroo (Ms. Robichaud) sought to obtain the pension benefits of her former and deceased husband, Winston Samaroo, relying on a property settlement agreement that had been incorporated into the parties divorce decree. *Id.* at 186–87. The agreement specifically provided:

> (d) Pensions, Profit Sharing and Bell System Savings Plan.
> Savings Plan—(1) Husband has a vested pension having a present value, if husband were to retire at this time, of $1,358.59 per month. At the time of husband's retirement and receipt of his pension he agrees to pay to wife one half of said monthly amount.

*Id.* at 187 (quoting the joint property agreement of the Samaroos). Neither the decree nor the property settlement agreement, however, mentioned any right of Ms. Robichaud to Mr. Samaroo's survivor's annuity. *Id.*

Thereafter, Mr. Samaroo died while still actively employed by AT & T. *Id.* Admittedly and at the time of his death, Mr. Samaroo did maintain a management pension plan with AT & T. *Id.* Nonetheless, because Mr. Samaroo did not live to an age where he would qualify to receive pension payments, there were no pension payments that ever became payable to him. *Id.* As a consequence, "the benefit expressly mentioned in the divorce settlement agreement never came to fruition." *Id.* The plan, however, did provide a qualified preretirement survivor annuity ("QPSA"),[9] which would have been available to the surviving spouse of any plan participant who passed after vesting but before retiring. *Id.*

---

**9.** *See* note 6, *supra.*

As a result, Ms. Robichaud sought to obtain the QPSA benefits from the plan. *Id.* The plan, however, denied her claim for the QPSA because the divorce decree made no mention of any entitlement to such right, and "in the absence of a surviving spouse or a QDRO designating a former spouse as such, there was simply no [QPSA] payable in respect of Samaroo." *Id.* Thereafter, Ms. Robichaud brought a civil action against the plan in New Jersey Superior Court, Chancery Division, to amend the final judgment of divorce *nunc pro tunc* to convey her a right to fifty percent of the QPSA. *Id.* at 188. The plan removed the action to federal court and filed a counter-claim, seeking declaratory relief. *Id.* The federal District Court remanded the portion of the removed case that involved the terms of the divorce, but retained jurisdiction of Ms. Robichaud's claim against the Plan for the retirement benefits. *Id.* at 188.

Notwithstanding Ms. Robichaud's testimony that "neither Winston ... [n]or [she] thought about the survivor rights to th[e] pension," the New Jersey state court held that the Plan did not have standing to object to alteration of the divorce decree. *Id.* It noted that "Winston Samaroo's estate did not oppose Robichaud's request to amend the decree *nunc pro tunc*, since conveying the survivorship rights once Samaroo was dead did not cost the estate anything, but undid the effect of Samaroo dying without a survivor." *Id.*

Following the state court's ruling, Ms. Robichaud and the Plan filed cross-motions for summary judgment in the federal District Court, requesting an examination of the statutory requirements for a QDRO under 29 U.S.C. § 1056(d)(3)(C) and (D). *Id.* 189. The District Court found that the amended divorce order satisfied the specificity requirements of section 1056(d)(3)(C), but not the substantive requirements of section 1056(d)(3)(D). *Id.*

On appeal, the Third Circuit concluded that the *nunc pro tunc* domestic relations order did not qualify as a QDRO if it required the plan to provide any type of benefits not otherwise provided by the plan or to provide increased benefits.

Subsequent to the Third Circuit's decision in *Samaroo*, the United States Circuit Court for the Ninth Circuit was met with a similar inquiry in *Tr. of Directors Guild of America–Producer Pension Benefits Plans v. Tise*, 234 F.3d 415 (9th Cir.2000). There, Yvonne Curry ("Ms.Curry"), the designated beneficiary of the pension plan of her deceased, domestic partner, Charles Myers ("Mr.Myers"), appealed the District Court's summary judgment distributing the majority of Mr. Myers' plan proceeds to the mother of his children Suzanne Tise ("Ms.Tise"). *Id.* at 417. Before Mr. Myers' death in 1995, three parties had emerged to assert competing claims regarding the proceeds of his pension plan: Ms. Curry, his designated beneficiary; Ms. Tise, who had obtained state-court child support orders; and the Internal Revenue Service ("IRS"). *Id.*

The basis of Ms. Tise's claim was premised on Mr. Myers' dereliction of the child support orders she had obtained for the two children born out of their relationship in 1981. *Id.* As a result of Mr. Myers' dereliction, Ms. Tise returned to the state court, to secure an order to show cause barring the Myers' pension plan from disbursing any proceeds from Myers' pension plan. *Id.* Although the order did not name the Myers' plan, the plan received a copy of the order in December of that year. *Id.* at 418. Shortly thereafter, the plan received an additional notice of levy from the IRS. *Id.* Met with two claims to Mr. Myers' pension, the plan notified Ms. Tise that Mr. Myer's pension was to become payable soon and that other parties were asserting entitlements to the plan proceeds. *Id.* In this notice, the plan asked Ms. Tise if it was her intention to obtain a QDRO pursuant to 29 U.S.C. § 1056(d)(3). *Id.*

In response, Ms. Tise immediately returned to the state court to obtain a writ of execution against the plan for the amount Mr. Myers' still owed in child support pursuant to the original 1981 judgment. *Id.* The state court ordered a writ of execution to issue, and in December 1994, Ms. Tise secured an order alleging that the plan had failed to comply with the writ of execution and enjoining the plan from distributing Mr.

Myers' plan proceeds until a QDRO could be obtained. *Id.* Unfortunately, Ms. Tise suffered a minor setback when the state court subsequently concluded that the plan had not been properly joined in the proceedings against Mr. Myers. *Id.* Following this ruling, she took steps to join the plan to the proceedings and moved for an order declaring her entitled to a QDRO on March 30, 1995. *Id.*

Meanwhile, Mr. Myers died on February 12, 1995. *Id.* According to the terms of his pension plan, all death benefits would be received by his designated beneficiary, Ms. Curry, who he had appointed only two months prior to his death. *Id.* Now faced with three claims, the pension plan filed an interpleader complaint in the United States District Court. *Id.* Ms. Tise moved for a stay of the interpleader action while she returned to the state court to secure a QDRO, which was granted by the District Court. *Id.*

Ms. Tise secured a QDRO from the state court, styled "Order re: QDRO for Child Support Arrears, Interest Accrued, Thereon and Attorney's Fees and Costs Relating to Enforcement of Child Support." *Id.* at 419. The state court determined that Ms. Tise was entitled to $326,438.85 in child support and attorneys' fees and issued an order *nunc pro tunc* to the order of October 11, 1991. *Id.* at 419. Thereafter, Ms. Tise presented her order to the District Court, which reallocated the proceeds of Mr. Myers' pension. As a result, both Ms. Curry and Mr. Myers' plan appealed.

On appeal, the Ninth Circuit commenced its discussion with an overview of ERISA as amended by the REA, which resulted in the court's conclusion that "because a QDRO only renders enforceable an already-existing interest, there is no conceptual reason why a QDRO must be obtained before the plan participant's benefits become payable on account of his retirement or death." *Id.* at 419–20. Thus, the court reasoned the several features of ERISA "erect no such requirement," for the potential alternate payee. *Id.* Specifically, the court noted:

*First,* for all the detail of the QDRO requirements, ERISA nowhere specifies that a QDRO must be in hand before benefits become payable.

*Second* and more significantly, the statute specifically provides for situations in which no valid QDRO issues until after benefits become payable. **Once the pension plan is on notice that a domestic relations order has issued that may be a QDRO, the plan may take a reasonable period to determine whether the order is a QDRO and therefore creates obligations for the pension plan. 29 U.S.C. § 1056(d)(3)(G)(ii). While the plan is making this determination, it must segregate the benefits that would be due to the alternate payee under the terms of the DRO during the first 18 months that those benefits would be payable if the DRO is ultimately deemed a QDRO. 29 U.S.C. § 1056(d)(3)(H)(v). This benefit-segregation requirement obviously assumes that benefits may already be payable during the period the plan is determining whether the DRO is a QDRO.**

Third, Congress expressly contemplated that further state court proceedings might ensue during the 18–month QDRO determination period, through which the alternate payee could attempt to cure any defects in the original DRO and obtain an enforceable QDRO. There is no reason it should take any plan administrator 18 months to puzzle over the domestic relations order initially presented to the plan in order to determine whether it is a QDRO, and Congress did not intend to sanction such administrative lassitude. Rather, the evident purpose of the 18–month period was to provide a time in which any defect in the original DRO could be cured. The statute therefore provides that the alternate payee may, within the 18–month period, present the plan administrator in lieu of the original court order, with a "modification thereof." 29 U.S.C. § 1056(d)(3)(H)(ii). If the plan administrator determines before the expiration of the 18–month fund segregation period that the modified

court order is a valid QDRO, the alternate payee is entitled to payment of benefits. *Id.*

\*     \*     \*

*Fourth,* **the statute also specifies with particularity the circumstances in which the putative alternate payee loses the right to hold up the payment of benefits to the participant or his designated beneficiary.** **After the 18 months have elapsed, if the DRO's status is still in doubt the plan must pay the segregated funds to the person who would otherwise have been paid.** 29 U.S.C. § 1056(d)(3)(H). If the plan thereafter determines that the alternate payee's DRO is a QDRO after all, the plan must begin to pay the pension benefits to the alternate payee as directed by the order, although the plan is not required to pay the alternate payee retrospectively. 29 U.S.C. § 1056(d)(3)(H)(iv). Only after the requisite 18 months have passed, that is, is it possible for a designated beneficiary to have a right to any part of a participant's pension plan proceeds that cannot be displaced by the QDRO.

*Tise,* 234 F.3d at 421–22 (emphasis added).

Consequently, the court concluded that ERISA "plainly contemplates" circumstances in which the event triggering the vesting of benefits (when the benefits become payable from the pension plan to the named beneficiary) before the pension plan determines that a QDRO is qualified and whether it will be obligated to make payments to an alternate payee. *Id.* at 422. Therefore, it established that ERISA "necessarily permits an alternate payee who has obtained a state law DRO **before the plan participant's retirement, death, or other benefit-triggering event** to perfect the DRO into a QDRO thereafter (subject to the 18–month period after which any previously-due benefits are payable to the original beneficiary)." *Id.* at 422–23. The court further reasoned that Ms. Tise's aggressive attempts to protect her interest in Mr. Myers' pension "in the face of vigorous resistance by the Plan," by converting the DRO into a QDRO in state court, fell squarely within the REA's purpose of improving the delivery

of retirement benefits and providing greater equity to the plans workers, spouses, and dependents. *Id.* at 423. *See also* Pub.L. No. 98–397; 98 Stat. 1426 (1984). Thus, because Ms. Tise had placed the plan on *notice* of her interest in Mr. Myers' pension plan proceeds before his death, the Ninth Circuit concluded that "the fact that he died before issuance of QDRO is immaterial." *Id.* at 426 (footnote omitted).

■ The cases cited above are not controlling, but we do find them instructive, as they provide evidence that a posthumous QDRO *may* be permissible dependent upon the circumstances leading to the QDRO's issuance. *Compare Samaroo v. Samaroo,* 193 F.3d 185 (3d Cir.1999) *with Tr. of Directors Guild of America–Producer Pension Benefits Plans v. Tise,* 234 F.3d 415 (2000). As a consequence, we acknowledge four considerations in determinating whether a posthumous QDRO permissibly entitles an alternate payee to all or a portion of an ERISA qualified pension:

(1) Was notice provided to the pension plan of the potential alternate payee's interest in the pension benefits prior to the participant's death?

(2) How aggressively did the potential alternate payee assert his or her interest before the participants death?

(3) Is the posthumous QDRO being issued *nunc pro tunc* to only correct a clerical error that was made in a previous DRO that was not qualified by the plan?

(4) Is there another beneficiary's rights infringed by the enforcement of the alternate payee's QDRO; and, if so, are the equities balanced?

Indeed, these four considerations are contemplated by Title I of ERISA.

■ Even so, it is a bedrock principle that ERISA expressly preempts state law (outside the exceptions provided by a QDRO) by making the regulation of pension plans falling under ERISA's governance a matter of exclusive federal interest. 29 U.S.C. § 1144(a) (stating that ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."); 29 U.S.C.

§ 1144(c)(1) (noting that the term "state law" includes all laws, decisions, rules, regulations, or other state action having the effect of law of any state). *See Eid v. Duke,* 373 Md. 2, 12, 816 A.2d 844 (2003) (acknowledging Congress' intention to create a *broad* preemption provision in the statute). To be sure, ERISA does maintain a savings clause, limiting preemption by stating that "nothing in this [title] shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A), *cited in Conn. General Life Ins. Co. v. Ins. Comm'r, State of Md.,* 371 Md. 455, 464, 810 A.2d 425 (2002).

■ Nonetheless, ERISA's "broad preemption provision was intended to eliminate possibly conflicting or inconsistent state and local regulations of employee benefits," *Eid,* 373 Md. at 12, 816 A.2d 844, and "to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations." *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (holding that 29 U.S.C. § 1144(a) preempted a New York law that required ERISA disability plans to provide maternity benefits because ERISA contained no such mandate at such time); *Alessi v. Raybestos–Manhattan,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) (holding that a New Jersey Law prohibiting pension benefit offsets for New Jersey workers compensation awards was preempted because ERISA permitted such offsets).

The Court of Appeals has previously outlined the extent to which the broad stroke to which ERISA's explicit preemption provision applies in *Eid v. Duke,* 373 Md. 2, 816 A.2d 844 (2003). There, writing for the court, Judge John C. Eldridge noted that

> [h]aving preempted state law, ERISA provides specific remedies that are available in federal courts. ERISA has an "overpowering federal policy in [its] civil enforcement provisions. 29 U.S.C. § 1132(a), authorizing civil actions for ... specific types of relief." *Rush Prudential HMO Inc. v.*

*Moran,* 536 U.S. 355, 122 S.Ct. 2151, 2164, 153 L.Ed.2d 375, 395 (2002) (footnote omitted). These provisions amount to an "interlocking, interrelated, and interdependent remedial scheme." *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96, 106 (1985). The United States Supreme Court has "been especially 'reluctant to tamper with [the] enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text." *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 209, 122 S.Ct. 708, 712, 151 L.Ed.2d 635, 642 (2002), *quoting Massachusetts Mutual Life Ins. Co. v. Russell, supra,* 473 U.S. at 147, 105 S.Ct. at 3093, 87 L.Ed.2d at 106. State laws that provide alternative remedies are preempted under ERISA, as frustrating the purpose of ERISA of providing "a uniform judicial regime of categories of relief." *Rush Prudential HMO Inc. v. Moran, supra,* 122 S.Ct. at 2169, 153 L.Ed.2d at 401. *See, e.g., Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (holding that Texas's [sic] tort of wrongful discharge conflicted with ERISA enforcement by converting an equitable remedy available in federal court to a legal one available in a state tribunal); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (holding that ERISA displaced state tort and contract claims based on allegedly improper denial of benefits under an ERISA plan).

*Eid,* 373 Md. at 12–13, 816 A.2d 844.

Therefore, "[i]n determining whether [Ms. Hunsecker's] claim [provided] under state law is preempted by ERISA, [we] must consider whether the claim 'relates to' an ERISA covered plan, such that granting relief based on the state law would provide a remedy not permitted by ERISA." *Eid,* 373 Md. at 13, 816 A.2d 844 (citation omitted). A claim "relates to" a covered employee benefit plan "if it has a connection with or reference to such a plan." *District of Columbia v. Greater Washington Board of Trade,* 506 U.S. 125, 129, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (quoting *Shaw,* 463 U.S. at 97, 103 S.Ct. 2890), *quoted in Eid,* 373 Md. at 13, 816 A.2d 844.

*See also Metro. Life Ins. Co. v. Pettit,* 164 F.3d 857, 861 (4th Cir.1998).

The meaning of the term "relates to" is—cryptic at best. The face value of the term "has no logical boundary." *Pettit,* 164 F.3d at 861 (citing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co. ("Travelers"),* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)). In an existential sense, everything relates to everything else. *Id.* (citation omitted). As a result, "[t]he United States Supreme Court has eschewed 'uncritical literalism' when construing the ERISA term 'relates to' and has look[ed] instead to the objectives of the ERISA statute as a guide' to the scope of preemption that Congress intended." *Eid,* 373 Md. at 13, 816 A.2d 844 (quoting *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671). *See Pettit,* 164 F.3d at 861. The Supreme Court has held, however, that "[a] state law relates to an ERISA plan if it has a **connection** with or reference to such a plan." *Egelhoff v. Egelhoff,* 532 U.S. 141, 147, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001) (citing *Shaw,* 463 U.S. at 97, 103 S.Ct. 2890) (emphasis added). *See Bigelow,* 283 F.3d at 440; *Manning v. Hayes,* 212 F.3d 866, 870 (2000). *Cf. Pettit,* 164 F.3d at 861–62. Accordingly, a reviewing court must determine whether there is a forbidden connection and does so by "look[ing] both to 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well as the nature of the effect of the state law on ERISA plans." *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (quoting *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671). *See also Carmona v. Carmona,* 603 F.3d 1041, 1061 (9th Cir.2010) (citing *Egelhoff,* 532 U.S. at 147, 121 S.Ct. 1322).

ERISA contains no general exclusion from its preemption provision for domestic relations laws or for the laws of contract and restitution. Indeed, the REA's amendments to ERISA explicitly provide that the former spouse of a plan participant can *only* replace the participant's current spouse and be treated as the surviving spouse by the pension plan

pursuant to a QDRO. *See* 29 U.S.C. § 1056(d)(3)(F); *Boggs v. Boggs*, 520 U.S. 833, 845–46, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (noting that only QDROs, not domestic relations orders in general, are saved from ERISA's general preemption provision and pension plan alienation provision); *Barrs v. Lockheed Martin Corp.*, 287 F.3d 202, 208 (1st Cir.2002) (noting the REA's creation of *valid* QDROs as the means by which ERISA's preemptive obstacles were avoided) (emphasis added); *Metro. Life Ins. Co. v. Bigelow*, 283 F.3d 436, 440 (2d Cir.2002) (acknowledging within the context of ERISA-governed benefit plans that if "the [j]udgment [directly affecting the benefits] is not a QDRO, then ERISA preempts" and prohibits the reassignment of beneficiary interests); *Hopkins v. AT & T Global Info. Solutions Co.*, 105 F.3d at 155. *Cf. Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 420–21 (6th Cir.1997) (holding that although any domestic relations order might not be barred by the anti-alienation provision, ERISA preempts all orders except those that meet the strictures of a QDRO); *Fox Valley & Vicinity Const. Workers Pension Fund v. Brown*, 897 F.2d 275, 279 (7th Cir.1990) (en banc) ("ERISA preempts any attempt to alienate or assign benefits by a domestic relations order if that order is not a QDRO").

Indeed, almost every United States Court of Appeals has determined that a state law governing the designation of an ERISA beneficiary to the pension plan "relates to" the ERISA plan, and is therefore preempted. *See Carmona*, 603 F.3d at 1061–62; *Melton v. Melton*, 324 F.3d 941, 945 (7th Cir.2003); *Manning*, 212 F.3d at 870; *Dial v. NFL Player Supplemental Disability Plan*, 174 F.3d 606, 611 (5th Cir. 1999); *Pettit*, 164 F.3d at 862; *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 15 (2d Cir.1993); *Metro. Life Ins. Co. v. Hanslip*, 939 F.2d 904, 906 (10th Cir.1991); *Brown v. Conn. Gen. Life Ins. Co.*, 934 F.2d 1193, 1195 (11th Cir.1991); *McMillan v. Parrott*, 913 F.2d 310, 311 (6th Cir.1990).

While not binding on this Court, we find the United States Court of Appeals for the Fourth Circuit's opinion in *Metropolitan Life Insurance Company v. Pettit*, 164 F.3d 857 (4th Cir.1998), instructive. Upon the death of the insured, Tom

Pettit ("Mr.Pettit"), the Metropolitan Life Insurance Company ("MetLife") sought to pay life insurance proceeds due under an ERISA qualified plan. *Id.* at 859. Mr. Pettit's designated beneficiary and widow, Patricia Pettit ("Patricia"), and Mr. Pettit's former wife, Betty Pettit ("Betty"), both claimed a portion of the insurance plans proceeds. *Id.* Betty's claim was premised on a settlement agreement in which she and Mr. Pettit entered at the time of their divorce that was incorporated but not merged into the divorce degree. *Id.* The property settlement agreement provided for a division of personal and real property, for the payment of alimony and other "general matters." *Id.* at 859–60. The agreement also required that Mr. Pettit maintain a $200,000 life insurance policy in favor of Betty and to transfer to Betty ownership of several life insurance policies issued by Connecticut Mutual, American Mutual, and Prudential. *Id.* at 860. The life insurance policy through MetLife, however, was not mentioned in their agreement nor incorporated into the divorce decree. *Id.*

Met with these competing claims, MetLife brought an interpleader action to determine the proper disposition of the insurance proceeds. *Id.* at 859. Thereafter, Betty filed a cross-claim against Patricia, seeking a constructive trust against the disputed proceeds. *Id.* The parties subsequently filed cross-motions for summary judgment. *Id.* Noting that Betty had failed to obtain a QDRO—the method ERISA provides for a divorced spouse to *enforce* his or her property rights within an ERISA plan—the District Court concluded that Betty's claim was preempted because it was based upon state law that related to an employee benefit plan. *Id.* Thus, the District court denied Betty's motion for summary judgment and awarded the proceeds to Patricia. *Id.* As a consequence, Betty noted an appeal to the Fourth Circuit. *Id.*

On appeal, the Fourth Circuit engaged in an analysis of ERISA's section 1144(a). It found that from the text of 29 U.S.C. § 1144(a), "it is clear that the life insurance policy qualifies as a welfare plan, and it is thus an employee benefit plan." *Id.* at 861. As a consequence, it found "no trouble determining that the constructive trust claim, which [was]

based upon the terms of a property settlement agreement entered to effect a property division upon divorce, meets the ERISA definition of state law," and was, likely "subject to preemption." *Id.* (citing *Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1480 (4th Cir.1996), and *Elmore v. Cone Mills Corp.,* 23 F.3d 855, 863 (4th Cir.1994) (en banc)).[10]

After concluding that the constructive trust derived out of a potentially conflicting state law claim, it engaged in an analysis of ERISA's construction to determine whether the claim for a constructive trust related to Mr. Pettit's employee benefit plan. *Id.* Applying the standard developed by the Supreme Court in *Egelhoff,* 532 U.S. at 147, 121 S.Ct. 1322, and *Shaw,* 463 U.S. at 97, 103 S.Ct. 2890, it concluded that a constructive trust claim against a plan beneficiary obviously maintains a direct effect and connection with an ERISA plan. *Pettit,* 164 F.3d at 862. Further, the court additionally noted that

> ... [I]t is once again worth noting that ERISA, by its own terms, provides a method for a former spouse to secure an interest in plan benefits. *See, e.g., Hopkins v. AT & T Global Info. Solutions Co.,* 105 F.3d 153, 157 (4th Cir.1997) (noting that a former spouse's interest in pension plan benefits "can be protected simply by obtaining a QDRO"). Under § 1144(b)(7), QDROs, as defined by § 1056(d)(3), are specifically excepted from preemption. See 29 U.S.C.[ ] §§ 1144(b)(7), 1056(d)(3) (West 1985 & Supp.1998). Two strong inferences flow from the QDRO exception. First, Congress understood that such state law domestic proceedings may "relate to" a plan such that the enforcement of a provision requiring payment from employee pension or welfare benefits would, absent the exception, be preempted. *See Boggs v. Boggs,* 520 U.S. 833, 117 S.Ct. 1754, 1763, 138

---

**10.** In *Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473 (4th Cir.1996), the Fourth Circuit concluded that the state tort law and contract claims "related to" ERISA plan administration are preempted. Further, in *Elmore v. Cone Mills Corp,* 23 F.3d 855 (4th Cir.1994) (en banc), the court noted the preemption of state law contract claims against an ERISA plan.

L.Ed.2d 45 (1997) (noting that "QDRO's, unlike domestic relations orders in general, are ... exempt from ERISA's general preemption clause"). Second, and more important to the question at hand, Congress meant to make a QDRO the acceptable method for a divorced spouse to attach an interest in a former spouse's benefit plan. ERISA thus maintains its own enforcement mechanism for aggrieved former spouses.

*Id.* at 863 (footnotes omitted). In affirming the District Court, the Fourth Circuit reasoned that, if permitted to stand, Betty's constructive trust claim against the pension plan, based upon a marital dissolution agreement, "would directly conflict with ERISA's goal of providing a nationally uniform plan administration and reduce the QDRO provisions to a meaningless footnote in the preemption context." *Id.* at 864. Therefore, it concluded that because Betty's constructive trust claim "interferes with Congress'[ ] clear objectives and conflicts with the plain language of ERISA, it must fall victim to the ERISA preemption provision." *Id.*

In instant case, Ms. Hunsecker admittedly entered into a voluntary separation agreement with her husband that provided an interest in his pension as well as death benefits. That agreement was integrated into the circuit court's judgment of absolute divorce. That judgment, therefore, constitutes a DRO pursuant to 29 U.S.C. § 1056(d)(3)(B)(ii). Nonetheless, Ms. Hunsecker sat on the judgment of divorce for eleven years without asserting any interest in Mr. Robinette's pensions. She presented no evidence that she made any effort to notify the pension of her potential interest, and sought to enforce an interest only after learning of her former-husband's death. In addition, the record fails support any inference that the Mr. Robinette's pension plan turned a blind-eye to any effort by Ms. Hunsecker to enforce her interest, because she never asserted her interest until after Mr. Robinette's death. Thus, it would appear that if Ms. Hunsecker's claim for entry of a QDRO posthumously or for a constructive trust were "related to" the pension plan, it would be preempted *if Mr. Robinette's employee benefit plans are covered by ERISA.* During argu-

ment before this Court, however, the parties agreed that Mr. Robinette's plan was not subject to ERISA. We agree with the parties and the explanation of how we reached that conclusion is appropriately provided *infra*.

In that regard, one generally must determine whether Mr. Robinette's employee benefit plans are covered or exempt from ERISA's broad preemptive ability. The employee benefit plans covered by and exempt from ERISA are set forth in 29 U.S.C. § 1003, which, in pertinent part, provides:

(a) In general. Except as provided in Subsection (b) or (c) [11] and in sections 201, 301, and 401 [29 U.S.C. §§ 1051, 1081, and 1101 [12]], this title shall apply to any employee benefit plan if it is established or maintained—

(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or

(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or

(3) by both

**(b) Exceptions for certain plans. The provisions of this title shall not apply to any employee benefit plan if—**

**(1) such plan is a governmental plan (as defined in section 3(32) [29 U.S.C. § 1002(32)[13]]);**

(2) such plan is a church plan (as defined in section 3(33) [29 U.S.C. § 1002(33) [14]]) with respect to which no election

---

**11.** 29 U.S.C. § 1003(c) concerns IRAs.

**12.** 29 U.S.C. §§ 1051, 1081, 1101 limit coverage as provided in section 1003(a), *supra*, by further precluding coverage to specific benefit plans.

**13.** *See* discussion of 29 U.S.C. § 1002(32), *infra*.

**14.** Section 1002(33) provides, in relevant part, that "[t]he term 'church plan' means a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of the Internal Revenue Code of 1986 [26 U.S.C. § 501]. 29 U.S.C. § 1002(33)."

has been made under section 410(d) of the Internal Revenue Code of 1986 [26 U.S.C. § 410(d)[15]];

(3) such plan is maintained solely for the purpose of complying with workmen's compensation laws or unemployment compensation or disability insurance laws;

(4) such plan is maintained outside the United States primarily for the benefit of persons substantially all of whom are nonresident aliens; or

(5) such plan is an excess benefit plan (as defined in section 3(36) [29 U.S.C. § 1002(36)]) and is unfunded.

29 U.S.C. § 1003(a) & (b) (1989) (emphasis added). Therefore, although ERISA's Title I requirements govern private pension plans, government plans—without a shadow of a doubt—are not subject to ERISA. *Id.* at § 1003(b)(1). *See Koval v. Washington County Redevelopment Authority*, 574 F.3d 238, 240 (3d Cir.2009); *Fromm v. Principal Health Care of Iowa, Inc.*, 244 F.3d 652, 653 (8th Cir.2001); *Hightower v. Tx. Hospital Ass'n*, 65 F.3d 443, 447 (5th Cir.1995); *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir.1995); *Alley v. Resolution Trust Corp.*, 984 F.2d 1201, 1206 (D.C.Cir.1993); *Shannon v. Shannon*, 965 F.2d 542, 544 (7th Cir.1992); *Shirley v. Maxicare Tex., Inc.*, 921 F.2d 565, 567 (5th Cir.1991); *Roy v. Teachers Ins. And Annuity Ass'n*, 878 F.2d 47, 48 (2d Cir. 1989); *Silvera v. Mut. Life Ins. Co.*, 884 F.2d 423, 425 (9th Cir.1989); *Rose*, 828 F.2d at 914.

---

**15.** 26 U.S.C. 410, entitled "Minimum participation standards," in relevant part, provides:

(d) Election by church to have participation, vesting, funding, etc., provisions apply.

(1) In general. If the church or convention or association of churches which maintains any church plan makes an election under this subsection (in such form and manner as the Secretary may by regulations prescribe), then the provisions of this title relating to participation, vesting, funding, etc. (as in effect from time to time) shall apply to such church plan as if such provisions did not contain an exclusion for church plans.

(2) Election irrevocable. An election under this subsection with respect to any church plan shall be binding with respect to such plan, and, once made, shall be irrevocable.

The Second Circuit Court of Appeals explained the development of the government exemption in *Rose v. Long Island R.R. Pension Plan,* stating:

Although Congress considered whether ERISA should apply to "public" or "governmental benefit plans, it ultimately decided to exempt such plans from compliance with most of ERISA's requirements." See H.R.Rep. No. 533, 1974 U.S.Code Cong. & Ad. News at 4647. Instead, Congress decided to undertake further study of the adequacy of public retirement plans, in order to determine "the necessity for Federal legislation and standards with respect to such plans." 29 U.S.C. § 1231(a)(3). *To date, no such legislation has been enacted.*

The governmental plan exemption was included for several reasons. First, it was generally believed that public plans were more generous than private plans with respect to their vesting provisions. H.R.Rep. No. 533, 1974 U.S.Code Cong. & Ad. News at 4667. Second, it was believed that "the ability of the governmental entities to fulfill their obligations to employees through their taxing powers" was an adequate substitute for both minimum funding standards and plan termination insurance. S.Rep. No. 383, 93d Cong., 2d Sess., reprinted in, 1974 U.S.Code Cong. & Ad. News 4890, 4965; H.R.Rep. No. 807, 93d Cong., 2d Sess., reprinted in, 1974 U.S.Code Cong. & Ad. News 4670, 4756–57. Finally, there was a concern that imposition of the minimum funding and other standards "would entail unacceptable cost implications to governmental entities." H.R. Rep. No. 807, 1974 U.S.Code Cong. & Ad. News at 4830. See also H.R.Rep. No. 533, 1974 U.S.Code Cong. & Ad. News at 4668.

**This Congressional reluctance to interfere with administration of public retirement plans is in part based on principles of federalism**. . . .

828 F.2d at 913–14 (emphasis added).

A government plan is one "established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by

any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1003(32). As a consequence, we must consider (1) whether Mr. Robinette's employment with MCPS—a public educational system—represents a political subdivision, agency, or instrumentality of the State and (2) whether his pension was established or maintained by a political subdivision, agency, or instrumentality of the State. *See, e.g., Shirley,* 921 F.2d at 567.

Unfortunately, ERISA does not define a "political subdivision," "agency," or "instrumentality" under 26 U.S.C. § 1002(32), nor has Maryland addressed the meaning of those terms within ERISA's context. Nevertheless, "[b]ecause ERISA is a federal statute, the term[s] 'political subdivision' [, 'agency,' and 'instrumentality'] must be interpreted by reference to federal law, in the absence of clear legislative intent to the contrary." *Rose,* 828 F.2d at 915, *quoted in Shannon,* 965 F.2d at 546. Therefore, we turn our attention to two tests developed and used by the United States Circuit Courts of Appeal to determine whether an entity is (a) a "political subdivision" or (b) an "agency" and "instrumentality" of the government for ERISA purposes.

The Second and Seventh Circuit Courts of Appeal have adopted the NLRB test, formulated by the United States Supreme Court in *Nat'l Labor Relations Bd. v. Natural Gas Utility Dist. Of Hawkins County, Tenn. ("Hawkins County"),* to determine what constitutes a "political subdivision" exempt from the NLRB's jurisdiction under the National Labor Relations Act. 402 U.S. 600, 604–05, 91 S.Ct. 1746; *See Shannon,* 965 F.2d at 547; *Rose,* 828 F.2d at 915–16. The NLRB test is comprised of two prongs—only one of which must be satisfied—and evaluates whether an entity is (1) "created directly by the State, so as to constitute government departments or administrative arms of the government," or (2) "administered by individuals who are responsible to public officials or to the general electorate." *Hawkins County,* 402 U.S. at 604–05, 91 S.Ct. 1746. *See also Shannon,* 965 F.2d at 548; *Rose,* 828 F.2d at 916.

The Second Circuit became the first court to apply the NLRB test in *Rose v. Long Island R.R. Pension Plan,* 828 F.2d 910 (1987). There, Richard Rose, a participant in the Long Island Railroad's pension plan, failed to elect a survivorship option, which would have provided survivorship benefits, to his wife ("Ms.Rose") prior to his pre-retirement death. *Id.* at 912. As a consequence, Ms. Rose's application for the issuance of the survivor benefits was denied by the Board of Managers and Joint Board on Pension Applications for survivorship benefits. *Id.* Thereafter, Ms. Rose commenced an action for survivor benefits and other relief in the United States District Court for the Eastern District of New York, alleging that the railroad company had violated section 205 of ERISA, 29 U.S.C. § 1055,[16] requiring that all retirement plans covered by ERISA provide benefits to the surviving spouse of a employee who dies prior to retirement. *Id.* The District Court concluded that the railroad plan was exempt from compliance with ERISA's vesting provisions because it was a "governmental plan," and dismissed Ms. Rose's complaint for lack of subject matter jurisdiction. *Id.*

On appeal, the Second Circuit began its discussion by tracing the history of Congress' decision to exempt public/government plans from ERISA's Title I requirements. *Id.* at 913–14. After concluding that a retirement plan is except from Title I requirements if it meets the requirements of 29 U.S.C. § 1003(32), the court subsequently considered the defi-

---

**16.** ERISA's section 205, recodified as 29 U.S.C. § 1055, entitled, "Requirement of joint and survivor annuity and preretirement survivor annuity," in relevant part, provides:

(a) Required contents for applicable plans. Each pension plan to which this section applies shall provide that—

(1) in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity, and

(2) in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant.

*Id.* at § 1055(a).

nition of the undefined term of "political subdivision" and its applicability to the Long Island Railroad Company, an initially private company ultimately acquired by the Metropolitan Transit Authority of New York, by looking toward the Supreme Court's decision in *Nat'l Labor Relations Bd. v. Natural Gas Utility Dist. Of Hawkins County, Tenn.*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971), which considered whether the respondent, Utility District, fell within the political subdivision exception to jurisdiction under the National Labor and Relations Act. *Id.* at 915–16 (citing *Hawkins County*, 402 U.S. at 604–05, 91 S.Ct. 1746). Adopting the *Hawkins County* Court's test, the Second Circuit explained that "[t]he NLRB guidelines are a useful aid in interpreting ERISA's governmental exemption, because ERISA, like the National Labor Relations Act, 'represents an effort to strike an appropriate balance between interests of employers and labor organizations.'" *Id.* at 916 (citations omitted).

Thereafter, the court initially applied the test to the Long Island Railroad's parent company, Metropolitan Transit Authority, and concluded that

[u]nder the *Hawkins County* analysis, the [Metropolitan Transit Authority (therein referenced as the "MTA") ] is clearly a political subdivision of the state because it satisfies both the alternate NLRB criteria. The MTA, a public benefit corporation, was created in 1965 by the Metropolitan Transit Authority Act, N.Y. Pub. Auth. Law §§ 1260 *et seq. See id.* § 1263(1)(a). The purposes of the MTA are "the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district." *Id.* § 1264(1). These purposes are "in all respects for the benefit of the people of the state of New York and the authority shall be regarded as performing an essential government function in carrying out is [sic] purposes and in exercising the powers granted by this [title of the Metropolitan Transit Authority Act]." *Id.* § 1264(2). Thus, the MTA meets the first criterion because it was "created directly by the state, so as to constitute [a] department or administra-

tive arm[ ] of the government." 402 U.S. at 604–05, 91 S.Ct. 1746.

*Rose*, 828 F.2d at 916. The court subsequently considered whether the Long Island Railroad was an "agency" or "instrumentality" of the government. *Id.* at 917–18. It noted that "[l]ike the term 'political subdivision,' the terms 'agency' and 'instrumentality' are not defined in ERISA, nor are there any regulations under ERISA which interpret" the terms. *Id.* at 917. Therefore, the court sought out other authority and acknowledged the Internal Revenue Service's ("IRS") interpretation of "agency or instrumentality" under 26 U.S.C. § 414(d),[17] a section added to the Internal Revenue Code by Title II of ERISA that defines "government plans" exempt from certain qualification requirements for favorable tax treatment. *Id.* at 917 (citing 26 U.S.C. §§ 410(c)(1)(A), 411(e)(1)(A), and 412(h)(3)). Further, the court concluded that the definition of "governmental plan" under 26 U.S.C. § 414(d) is "virtually identical to the definition in 29 U.S.C. § 1002(32)."[18] Because of the almost identical language, and because the court recognized the IRS as one of the agencies charged with administering ERISA, it concluded that "its interpretations of the statute are entitled to great deference." *Id.* at 919 (citations omitted). Thus, the court additionally adopted the six factors on which the IRS "consistently relie[s]," which specifically state:

In cases involving the status of an organization as an instrumentality of one of more states or political subdivisions, the following factors are taken into consideration: (1) whether it is used for a governmental purpose and performs a government function; (2) whether performance of its

---

17.  *See* note 19, *infra*, for direct language within section 414(d).

18.  The language of 26 U.S.C. 414(d), specifically provides:

(d) Governmental plan. For purposes of this part [26 U.S.C. § 401 et seq.], the term "governmental plan" means a plan established and maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing. . . .

function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for creation and/or use of such an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the source of its operating expenses.

Rev. Rul. 57–128 (I.R.S.1957), *quoted in Rose*, 828 F.2d at 918.

The court subsequently considered all six of the IRS' criteria and concluded that the evidence in record demonstrated that the Long Island Railroad satisfied all six of the criteria. *Rose*, 828 F.2d at 918. Further, after determining that the Long Island Railroad had established or maintained the plan, the court ultimately determined it was exempt from ERISA's Title I provisions. *Id.* at 921.

Met with a similar inquiry in *Shannon v. Shannon*, the United States Circuit Court of Appeals for the Seventh Circuit looked to the Second Circuit's analysis in *Rose* to determine the appropriate test in determining whether a non-profit, corporate lessee and operator of a city-owned hospital facility's insurance plan was operated by a government agency or instrumentality. 965 F.2d at 546. As a consequence, it additionally adopted the NLRB test, concluding that "the proper test is the one implicitly approved, with limitations, in [*Hawkins County* ]." *Id.* at 547. Unlike the Second Circuit, the court noted, however, that the NLRB test may not be an appropriate analysis in all circumstances, stating:

There is a caveat: "the Court expressly declined to decide whether the actual operations and characteristics' of an entity must necessarily feature one or the other of these . . . limitations to qualify. . . ." [*Hawkins County,* 402 U.S. at] 605 [91 S.Ct. 1746]. This caveat is in keeping with an earlier statement of the Court in a similar vein: "[T]here is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-

immune instrumentality ..." *Department of Employment v. United States,* 385 U.S. 355, 358–59, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966) (federal instrumentalities like the American Red Cross are exempt from state taxation). Consequently, the NLRB test from [*Hawkins County*] has not been deemed definitive in all applications....

*Shannon,* 965 F.2d at 548. Notwithstanding this caveat, the court found the NLRB test appropriate to the matter before it and subsequently turned to the test's application by the Supreme Court, by the court's sister circuits, and by its own application within the context of labor and employment cases. *Id.* at 548–49.[19] Following this discussion, the court outlined the required steps to be considered in an NLRB test analysis:

[W]e would first determine, *based on the record,* if the entity had been created directly by the state or a political

---

**19.** *See Nat'l Labor Relations Bd. v. Kemmerer Village, Inc.,* 907 F.2d 661 (7th Cir.1990) (noting that Kemmerer village was "heavily subsidized by the state and was 'seeking to accomplish something the state want[ed] accomplished'" but finding that "was not enough, however, to make the corporation a governmental subdivision" because "the state neither created nor acquired it, it was not organized as governmental entity, and there were no public directors."); *Nat'l Labor Relations Bd. v. Parents and Friends of Specialized Living Center,* 879 F.2d 1442 (7th Cir.1989) (concluding that a corporation that was licensed and regulated by the state, that was funded by the state, and that was operating a state-built facility was not a governmental entity because it was "a not-for-profit corporation operat[ing] a hospital pursuant to a contract with the state as opposed to a statutory duty"); *Brock v. Chicago Zoological Soc'y,* 820 F.2d 909 (7th Cir.1987) (applying the basic rules of agency to determine whether the zoological society was a governmental entity and concluding that it was not because it was "deliberately designed [] as a private entity to be operated independently of the District and other state agencies."); *Jefferson County Cmty. Center for Developmental Disabilities v. Nat'l Labor Relations Bd.,* 732 F.2d 122 (10th Cir.1984) (noting that while the center operated as a part of state-formulated health care scheme, it did "not [do so] as a state-created department or administrative arm of government, but essentially as a private contractor," despite having seven out of fifteen publicly-appointed board members); *Truman Medical Center, Inc., v. Nat'l Labor Relations Bd.,* 641 F.2d 570 (8th Cir. 1981) (concluding that the center was a private entity despite having been formed at the insistence of the City, but noting that it was neither created by statutory or by act of any public official nor contracting under any legislative directive).

subdivision, such as a city, so as to constitute a department or arm of the government. If it had not been, we would then determine, *based on the record,* if the entity was administered by individuals who are responsible to public officials or the general electorate.

*Id.* at 550 (emphasis added). The court noted, however, that in that instance, because neither the parties nor the trial court had used the NLRB test, it was required to look at the facts on which the trial court had relied and the facts reargued by the plaintiffs on appeal. *Id.*

Thereafter, the court concluded that hospital was not a governmental agency or instrumentality after considering several factors. *Id.* at 550–52. First, although the city had initially created the hospital, ownership of realty by a government and the subsequent lease of that realty to a nonprofit corporation, "without more, does not prove the corporation was created by the state so as to constitute a department or administrative arm of the government." *Id.* at 550. Second, the court acknowledged that while ten community council-appointed members had incorporated the corporation, it was not created as "a department or arm of the government," because the corporation had replaced the city as operator of the hospital. *Id.* at 551. Third, the court noted that the city had not maintained control over the hospital's board because it did not maintain removal power and did not maintain any power to appoint or reappoint members of the hospital's board. *Id.* Moreover, the court recognized that the hospital had maintained separate payrolls, health insurance plans, and pension plans that were apart from the city's control or establishment. *Id.* at 552. Therefore, the court ultimately concluded that because the hospital was not a government subdivision, agency, or instrumentality, its employee benefit plan could not be characterized as a government plan under the NLRB analysis and, therefore, the federal court could not exercise jurisdiction pursuant to ERISA. *Id.*

In contrast, the D.C. Circuit Court of Appeals has applied an "employer-relationship" test as laid out in *Alley v. Resolution Trust Corp.,* 984 F.2d 1201 (D.C.Cir.1993). The employ-

er-relationship test, used to determine whether a federally chartered savings and loan association constituted a government entity, requires an analysis of whether the entity relates to its employees as a private business or treats them as government workers. *Id.* at 1206. (finding that the Federal Asset Disposition Association ("FADA"), formed by the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation, was not a governmental entity because its employees "were outside the civil service system, and were not subject to personnel rules or restrictions on salaries and benefits imposed generally on federal employees"). It noted that "in its employment relationships—*the area most relevant for ERISA purposes*—FADA functioned not like a governmental agency, but like a private enterprise." *Id.* (emphasis added). Following an evaluation of ERISA's text and legislative history, the court explained its approach as rooted in the

> background assumption underlying the governmental plan exemption ... that public employees exempted from ERISA were in fact covered by some distinctly "public" employment benefit scheme. *Cf.* 29 U.S.C. § 1002(32) (plans of *private employers* governed by the Railroad Retirement Act of 1935 or 1937 specifically exempted from ERISA as "government plans"). We find no indication that Congress meant the governmental plan exemption to reach an entity that relates to its employees as would a private business—an entity whose employees are not subject to the laws governing public employees generally.

*Id.* (emphasis in original). *Accord McGraw v. Prudential Ins. Co. of America*, 137 F.3d 1253, 1258 (1998) (applying Alley's analysis and concluding that the plaintiff-participant's retirement and insurance plans offered by LifeFleet, Inc., and Emergency Medical Services Authority, an Oklahoma public trust, was not a governmental plan because "the terms and conditions of his employment more closely resemble those of private sector employees," and, therefore that the plan was not exempt from ERISA's provisions).

In the instant case, however, we are required neither to decide nor adopt an appropriate test to determine whether Mr. Robinette's MCPS plan was, in fact, a government plan exempt from ERISA's Title I provisions pursuant to 29 U.S.C. § 1003(b)(1). Nor are we required to determine whether Ms. Hunsecker's claims "relate to" Mr. Robinette's pension plans. At oral argument, the parties both agreed that Mr. Robinette's pension plan was a government plan exempt from ERISA's provisions. Therefore, we review the trial court's judgment under the presupposition that the government plan exemption is applicable to the case at bar.[20] As a consequence, any application of state law is not precluded by ERISA's broad preemptive powers. In that regard, the circuit court committed no error in granting Ms. Hunsecker a posthumous Domestic Relations Order to be qualified by Mr. Robinette's government pension plan on the basis of her voluntary separation agreement with Mr. Robinette, recognizing her interest in his pensions. *See generally Eller, supra,* 168 Md.App. at 116, 895 A.2d 382 (noting that the circuit court may enforce a settlement agreement that has been incorporated but not merged into the divorce decree as an independent

---

**20.** We stress, however, that "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8–131(a). Consequently, the reviewing court should review a grant of summary judgment only on the grounds relied upon by the trial court. *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726 (2001); *PaineWebber Inc. v. East,* 363 Md. 408, 422, 768 A.2d 1029 (2001); *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995) (citations omitted). As the Court of Appeals stated in *Geisz v. Greater Baltimore Medical,* 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988):

On an appeal from the grant of summary judgment which is reversible because of error in the grounds relied upon by the trial court the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment.

*Id.,* quoted in *Orkin v. Holy Cross Hospital of Silver Spring, Inc.,* 318 Md. 429, 435, 569 A.2d 207 (1990). *Accord Blades,* 338 Md. at 478, 659 A.2d 872. Nevertheless, this general rule of review matters not in the case at bar because both parties agreed at argument that ERISA is inapplicable.

contract, "subject to the objective law of contract interpretation.") (citing *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 890 A.2d 737 (2006)); *Prince George's Cnty. Police Pension Plan v. Burke*, 321 Md. 699, 708, 584 A.2d 702 (1991) (holding that a state government pension plan may be properly ordered to tender direct payment to the former spouse of the plan participant pursuant to Md.Code (1984, 2012 Repl.Vol.), § 8–502(a) of the Family Law Article not withstanding any anti-alienation clause and spendthrift provision provided by the plan).

### (B) The Imposition of a Constructive Trust Regarding the Benefits Already Paid by the Pension Plan.

■ In her second assignment of error, Ms. Robinette additionally contends that the circuit erred by imposing a constructive trust on the benefits already issued by the pension plan for two reasons. First, she asserts that the imposition of a constructive trust on the funds already distributed by the plan was preempted by ERISA.[21] Second, Ms. Robinette argues that, even if the imposition of a constructive trust is not preempted by ERISA, the facts of this case do not present circumstances requiring the imposition of a constructive trust because any inequitable harm suffered by Ms. Hunsecker was self-created. Stated simply, Ms. Robinette insists that Ms. Hunsecker's prior failure to obtain a QDRO demonstrates "a lack of concern for her own rights[;]" and, therefore, she lacks an ability to prove that she maintains a higher equitable call than Ms. Robinette. In light of the circumstances presented before this Court, we conclude, however, that a court may impose a constructive trust for benefits that were distributed by the pension plan.

---

21. As observed, *supra* Part III(A), because the parties agree that Mr. Robinette's pension plan was a government plan not governed by ERISA, Ms. Robinette's preemption claim related to ERISA's anti-alienation provision must fail. We therefore only address her second argument regarding the imposition of the constructive trust in contravention of the principles of equity.

■ It is well-established that "[a] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest[,] equity converts him [or her] into a trustee." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 122 N.E. 378, 380 (1919), superseded by statute, N.Y. GEN. OBLIG. Law § 15–301(1) (MicKinney 1963) (providing that a written agreement or other instrument containing a provision that said agreement cannot be changed orally, "cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent"), *as recognized in Israel v. Chabra*, 12 N.Y.3d 158, 878 N.Y.S.2d 646, 906 N.E.2d 374, 377–78 (2009). *See Hartsock v. Strong*, 21 Md.App. 110, 116, 318 A.2d 237 (1974) (quoting *Beatty, supra*). *See also McCafferty v. McCafferty*, 96 F.3d 192, 198 (6th Cir.1996) (quoting *Ferguson v. Owens*, 9 Ohio St.3d 223, 459 N.E.2d 1293 (1984)); *Bush v. Taylor*, 912 F.2d 989, 993 & n. 6 (8th Cir.1990); *Jones v. Harrison*, 250 Va. 64, 458 S.E.2d 766, 769–70 (1995) (observing that "[c]onstructive trusts occur not only where property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit.") (quoting *Richardson v. Richardson*, 242 Va. 242, 409 S.E.2d 148, 150 (1991)); *Singer v. Jones*, 173 Wis.2d 191, 496 N.W.2d 156, 158 (App.1992) (recognizing that a " 'constructive trust is an equitable device created by law to prevent unjust enrichment, which arises when one party receives a benefit, the retention of which is unjust to another. . . .' ") (quoting *Wilharms v. Wilharms*, 93 Wis.2d 671, 287 N.W.2d 779, 783 (1980)); *Head v. Metro. Life Ins. Co.*, 449 N.W.2d 449, 455 (Minn.Ct.App.1989) ("[A] constructive trust arises where a person has an equitable duty to convey property to another and, if allowed to keep the property, would be unjustly enriched at the other's expense.") (citing *Marquette Appliances, Inc. v. Econ. Food Plan, Inc.*, 256 Minn. 169, 97 N.W.2d 652,

654 (1959)); *Simonds v. Simonds,* 45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d 189, 193–94 (1978). Indeed, Maryland's appellate courts have long-recognized that

> [a] constructive trust is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property. The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, **or where the circumstances render it inequitable for the party holding the title to retain it.**

*Wimmer v. Wimmer,* 287 Md. 663, 668, 414 A.2d 1254 (1980). *See also Bowie v. Ford,* 269 Md. 111, 118–19, 304 A.2d 803 (1973); *O'Connor v. Estevez,* 182 Md. 541, 555, 35 A.2d 148 (1943); *Springer v. Springer,* 144 Md. 465, 478–79, 125 A. 162 (1924); *Starleper v. Hamilton,* 106 Md.App. 632, 637, 666 A.2d 867 (1995).

▇▇▇▇ Nevertheless, the Court of Appeals has explicitly provided that the remedy is not to be used "as a means of attempting to right every wrong." *Wimmer,* 287 Md. at 671, 414 A.2d 1254 (noting that "[t]he courts' equitable powers are not so broad."). *See Starleper,* 106 Md.App. at 637, 666 A.2d 867. Thus, "[i]n the ordinary case, there must be clear and convincing evidence not only of wrongdoing, but also of the circumstances which render it inequitable for the [possessor] of the [property] to retain the beneficial interest." *Wimmer,* 287 Md. at 668, 414 A.2d 1254 (citing *Peninsula Meth. Homes v. Cropper,* 256 Md. 728, 737, 261 A.2d 787 (1970)). *See, e.g., Potts v. Emerick,* 293 Md. 495, 497–500, 508–09, 445 A.2d 695 (1982) (discussing a series of circumstances giving rise to the imposition of a constructive trust); *Hartsock, supra,* 21 Md. App. at 118, 318 A.2d 237 (noting that there was "no difficulty in holding that the evidence was sufficient for the trial court to conclude that a constructive trust arose as a result of [defendant's] failure or refusal to do that which he ought to have done[ ]"). *Cf. Wooddy v. Wooddy,* 258 Md. 224, 233, 265 A.2d 467 (1970). Further, "in most cases, unless there is an acquisition of property in which another has some good equita-

ble claim, no constructive trust may be imposed." *Wimmer,* 287 Md. at 671, 414 A.2d 1254. Although, "[i]t is, of course, not necessary that there be fraud in order to give rise to the creation of a constructive trust." *Hartsock,* 21 Md.App. at 118, 318 A.2d 237 (citations omitted). Rather, "[i]t is enough that the 'conscience' of a court of equity would be traumatized if the legal title holder were allowed to deprive the beneficial owner of that which in good conscience belongs to the beneficial owner." *Id.* (citing *Beatty, supra,* 122 N.E. at 380). *Cf. Starleper,* 106 Md.App. at 638, 666 A.2d 867.

This Court most recently addressed the imposition of a constructive trust arising out of another issue within a domestic matter in *Starleper v. Hamilton,* 106 Md.App. 632, 666 A.2d 867 (1995). There, Gary Hamilton ("Gary") and Sharon Starleper ("Sharon") entered into a voluntary separation agreement prior to the circuit court's judgment of absolute divorce in 1984. *Id.* at 634, 666 A.2d 867. At that time, Gary owned a life insurance policy issued by one of the State Farm insurance companies. *Id.* As a consequence, Paragraph 10 of the separation agreement provided that Gary would "keep his current State Farm life insurance policy in effect to be used for the support, maintenance and education of the [parties' son, Justin,] in the event of [Gary's] death[; and, that] said fund [would] be administered by [Sharon], and, if [Gary] so desire[d], another party as trustee." *Id.*

When the parties executed the voluntary separation agreement and the divorce was granted, Gary's insurance policy designated Sharon as the primary beneficiary and Justin as a successor or contingency beneficiary. *Id.* at 635, 666 A.2d 867. Nevertheless, when Gary remarried in 1991, he listed his second wife ("Sandra") as the primary beneficiary of the State Farm policy, keeping, however, Justin as the successor or contingent beneficiary. *Id.* Gary, Sandra, and her son from an earlier marriage lived together until shortly before Gary's death in April of 1994. *Starleper,* 106 Md.App. at 635, 666 A.2d 867. Sandra used $20,000 of the $29,887 in Gary's life insurance benefits to purchase a home. *Id.* Notably, however, "Sandra received a letter from Sharon's attorney, informing

her, for the first time, of a claim by Justin to the insurance proceeds[,]" on the day before settlement on the home. *Id.*

Gary's ex-wife, Sharon, filed a complaint against Sandra, seeking the imposition of a constructive trust on the remaining insurance proceeds and on Sandra's new home, up to the amount of the insurance proceeds used to purchase the home, on behalf of Justin and herself. *Id.* The circuit court rejected Sharon's argument, concluding:

> By accepting the insurance money from State Farm after her husband's suicide, [Sandra] breached no duty to anyone, therefore, the retention of that sum and the use of that money to secure the purchase of real estate was not wrongful. Accordingly, imposing a constructive trust upon [Sandra's] home, the remaining money or other acquisition derived from the insurance payment would be contrary to the existing law of our State.

*Starleper,* 106 Md.App. at 636, 666 A.2d 867 (additions in original) (quotation marks omitted). Sharon subsequently noted an appeal to this Court.

In assessing whether the equity court could impose a constructive trust upon the proceeds of Gary's life insurance policy "in the hands of a substituted beneficiary," Chief Judge Alan M. Wilner (later, Judge Wilner of the Court of Appeals), observed that "nearly all of [our sister jurisdictions] have concluded that imposition of a constructive trust is a proper means of enforcing agreements to maintain insurance for designated beneficiaries." *Id.* at 638, 666 A.2d 867. Judge Wilner additionally noted the rationale for imposing a constructive trust on insurance proceeds in this kind of case, explaining that

> "[m]any cases have dealt with situations similar to the present one, wherein a deceased party to a divorce permitted a life insurance policy to lapse by failing to pay the premiums, or changed the beneficiary to the policy, contrary to the requirements of the marital settlement agreement.... In such cases, the agreement requiring the insured to maintain a particular beneficiary on a policy gives

that beneficiary vested rights in the proceeds of that policy. Accordingly, courts have imposed constructive trusts on the proceeds of the deceased's life insurance because **the marital settlement agreement gives the former spouse or children named as beneficiaries in the binding agreement a superior equitable interest in the life insurance proceeds over later named beneficiaries.**"

*Starleper,* 106 Md.App. at 639–40, 666 A.2d 867 (quoting *Perkins v. Stuemke,* 223 Ill.App.3d 839, 166 Ill.Dec. 103, 585 N.E.2d 1125, 1127 (1992)) (emphasis added).

Judge Wilner cautioned, however, that

[t]he factual circumstances in these cases often vary. The language of the marital agreement differs, as does the nature of the violation by the decedent. Sometimes, he or she allows the policy to lapse entirely; sometimes the policy is replaced with a new policy having different terms or beneficiaries; sometimes, as here, the policy is maintained but the beneficiary is changed. **Because a constructive trust is an equitable remedy, the court must consider all of the relevant circumstances in deciding whether it is an appropriate remedy in a given case.** As is the rule generally with respect to equitable remedies, a constructive trust is not a matter of right, *ex debito justitiae,* but rests in the discretion of the court, to be imposed or denied according to the circumstances of the case. . . .

*Id.* at 640, 666 A.2d 867 (citing generally, *Wimmer, supra* ). Because we concluded that consideration of all the circumstances was a test to be first addressed by the circuit court, we remanded the case in order for the court to undertake such an examination and advised the court that wrongdoing is "not a necessary precondition" to the imposition of a constructive trust. *Id.*

Much like the issue in *Starleper,* the imposition of a constructive trust on benefits already issued by the pension plan is a case of first impression. As a consequence, we draw our guidance from the courts of other jurisdictions. *Cf. Starleper,* 106 Md.App. at 638–39, 666 A.2d 867. To that end, while not

directly on point, we find the United States Bankruptcy Court for the Southern District of Ohio's opinion in *McGraw v. McGraw*, 176 B.R. 149 (Bankr.S.D.Ohio 1994), instructive.

Following an eighteen year marriage, retired Naval officer Kerry L. McGraw ("Kerry") and his wife, Jenifer McGraw ("Jenifer") were divorced in October of 1993. *McGraw*, 176 B.R. at 150. The entry of the parties' divorce decree—signed by both Kerry and Jenifer as well as by their respective counsels—stipulated to the following allocation of Kerry's Navy pension:

> ... **[Jenifer] shall receive as and for a division of property, thirty-six and one-half percent ... of the total gross pension benefits that [Kerry] receives from his military pension.**
>
> This [c]ourt specifically finds that [Kerry] is retired from the Navy after twenty ... years of service. [Kerry] receives a military pension of approximately One Thousand One Hundred Dollars ($ 1,100[ ]) per month. The [c]ourt finds that out of [Kerry's] twenty ... years in the military, the parties were married fourteen and one-half ... years. Therefore, [Jenifer] is entitled to thirty-six and one-half [percent] ... of the gross pension benefits received by [Kerry], including any increases for cost of living or on any other basis, subsequent to July 1, 1993.
>
> The [c]ourt further orders that [Kerry] shall pay to [Jenifer] thirty-six and one-half percent ... of all benefits that he has received beginning July 1, 1993 and continuing until further order of the [c]ourt.
>
> . . .
>
> The [c]ourt specifically finds that the pension benefits are divided as a division of property and therefore, there will be no order that the benefits are divided on the basis of a joint and survivorship division.
>
> . . .
>
> **Neither [Jenifer] [n]or [Kerry] shall be obligated to pay the other spousal support of any kind or nature.**

*McGraw*, 176 B.R. at 150 (emphasis added). In addition, the divorce court ordered that arrangements should be made for Jenifer to receive her portion of the pension directly from the government plan, rather than from Kerry. *Id.*[22] Shortly thereafter, Jenifer began receiving her portion of the pension. *Id.*

Approximately four months after entry of the divorce decree, Kerry filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.[23] Before the Bankruptcy Court, Kerry averred that the divorce "decree merely ordered a property division, giving rise to a debt that places Jenifer . . . in the status of an unsecured creditor." *Id.* at 150–51. Therefore, he argued that the "obligation" he owed to Jenifer as an unsecured creditor should be discharged.[24] In contrast, Jenifer argued that, because the property was divided through the divorce decree, her portion of the Navy pension "never bec[a]me property of [Kerry's] estate and thus [his] obligation cannot be subject to discharge." *Id.* at 151.

The Bankruptcy Court agreed with Jenifer. *McGraw*, 176 B.R. at 151. In rendering its disposition, the court found that "[w]hen the [d]omestic [r]elations court awarded a portion of [Kerry's] pension to [Jenifer], she became the equitable owner of 36½ % of the pension fund and that percentage became her sole and separate property." *Id.* As a result, the court concluded that "when a [government pension plan participant] fails to turn over property divided under a domestic relations court order, **that property may be subject to a constructive trust or equitable lien** in favor of the [participant's former]

---

**22.** Based on the facts provided in *McGraw*, it is unclear what notice was provided to the government plan in order for Jenifer to begin receiving her portion of the Navy pension.

**23.** Unlike Chapters 11 and 13 of the Bankruptcy Code, governing the process of reorganization of a debtor in bankruptcy, Chapter 7 governs the process of liquidation under the bankruptcy laws of the United States. *Compare* 11 U.S.C. § 701 (1986) *et seq. with* 11 U.S.C. § 1101 (1978) *et seq.* and 11 U.S.C. § 1301 (1984) *et seq.*

**24.** *See* 11 U.S.C. § 727 (2005), for provisions governing the discharging of debts pursuant to Chapter 7 of the Bankruptcy Code.

spouse." *Id.* (citing *Bush v. Taylor*, 912 F.2d 989 (8th Cir. 1990)) (emphasis added). While the Bankruptcy Court acknowledged that it "should not impose a constructive trust on property in favor of a particular creditor since nowhere in the Bankruptcy Code does it say, 'property held by the debtor subject to a constructive trust is excluded from the debtor's estate[,]" *id.* (citing *In re Omegas Group, Inc.*, 16 F.3d 1443 (6th Cir.1994)), it recognized that when a court of competent jurisdiction ordered property divided between spouses prior to a debtor's bankruptcy petition, "the [pension participant] at best could hold only legal title to that property awarded to the [former] spouse." *McGraw*, 176 B.R. at 151.

Admittedly, the court cautioned, much like Judge Wilner in *Starleper, supra*, 106 Md.App. at 640, 666 A.2d 867, that the imposition of a constructive trust " 'should not be impressed cavalierly.' " *Id.* (quoting *In re Omegas Group, Inc.*, 16 F.3d at 1451). Nonetheless, the court reasoned that "[i]t could be argued [that] ... where there is a valid [d]omestic [r]elations [c]ourt order predating the bankruptcy, there has in fact been a judicial determination by a court in a separate proceeding that the [government pension participant's] property is held for the benefit of another." Thus, the court noted that any "equities to be weighted ... must be weighed in light of the divorce decree." *Id.* at 152. Therefore, the court imposed a constructive trust to protect Jenifer's interest in the pension benefits. *See id.*

As Ms. Hunsecker points out, several other bankruptcy courts that have addressed the issue of a former spouse's equitable title to a government plan's benefits have concluded, relying on state law, that imposition of a constructive trust is a proper means of enforcing legal agreements or judicial orders to maintain the former spouse's interest in the pension benefits. *See In re Combs*, 435 B.R. 467, 477–78 (Bankr.E.D.Mich. 2010) (concluding that "each month when [the participant] receives his monthly pension payments, he holds a portion of the benefits in as a constructive trustee for the benefit of the former spouse"); *Brown v. Pitzer*, 249 B.R. 303 (Bankr. S.D.Ind.2000) (noting that a government pension is not gov-

erned by ERISA and, relying on state law to determine the former spouse's pension interest, and concluding that participant, "in equitable effect," was acting as constructive trustee to the former spouse's portion of the benefits); *In re Naydan,* 162 B.R. 204 (Bankr.W.D.Ark.1993) (concluding that a state court's imposition of a constructive trust on a government participant's entire estate does not contravene bankruptcy law; and, because the participant had no equity in the property it could therefore not be discharged); *Resare v. Resare,* 142 B.R. 44 (Bankr.D.R.I.1992) (concluding that a portion of the participant's military pension vested as his former spouse's sole and separate property upon entry of the divorce decree); *In re Kinder,* 133 B.R. 151 (Bankr.W.D.Mo.1991); *In re Dahlin,* 94 B.R. 79 (Bankr.E.D.Va.1988) (noting that the wife's interest in husband's military pension "benefits became the sole and separate property of [the wife] and the [husband] only received benefits as trustee"). We therefore return to Maryland's law to determine what, if any, interest Ms. Hunsecker maintains in Mr. Robinette's MCPS pension benefits. *See, e.g., In re Combs,* 435 B.R. at 471.

██ Section 8–105(a)(2) of the Family Law Article provides that a "court may enforce by power of contempt or as an independent contract not superseded by the divorce decree the provisions of a deed, agreement, or settlement that contain language that the deed, agreement, or settlement is incorporated but not merged into a divorce decree." Md.Code (1984, 2012 Repl.Vol.), § 8–105(a)(2) of the Family Law Article. *See Janusz v. Gilliam,* 404 Md. 524, 534–35, 947 A.2d 560 (2008) ("Such agreements are subject to the general rules of contract interpretation") (citing *PaineWebber, Inc. v. East,* 363 Md. 408, 413–14, 768 A.2d 1029 (2001)); *Eller, supra,* 168 Md.App. at 116, 895 A.2d 382 (citing *Dennis v. Fire & Police Employees' Ret. Sys.,* 390 Md. 639, 890 A.2d 737 (2006)). "In construing a contract, we look first to the particular language of the contract, and 'we give effect to its plain meaning and do not delve into what the parties may have subjectively intended.'" *Eller,* 168 Md.App. at 116, 895 A.2d 382 (quoting *Rourke v. Amchem Prods., Inc.,* 384 Md. 329, 354, 863 A.2d 926 (2004)).

"We also examine 'the character of the contract, its purpose, and the facts and circumstances of the parties at that time of execution.' " *Janusz, supra,* 404 Md. at 540, 947 A.2d 560 (quoting *Moscarillo v. Prof'l Risk Mgmt. Serv., Inc.,* 398 Md. 529, 540, 921 A.2d 245 (2007) (quoting *Litz v. State Farm Fire & Cas. Co.,* 346 Md. 217, 224–25, 695 A.2d 566 (1997))).

Admittedly, a claim of unjust enrichment, a quasi-contract claim, "may not be brought where the subject matter of the claim is covered by the express contract between the parties." *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc. ("Dashiell"),* 358 Md. 83, 96, 747 A.2d 600 (2000) (quoting *FLF, Inc. v. World Publ'ns, Inc.,* 999 F.Supp. 640, 642 (D.Md.1998)). "Although we rarely depart from this long-standing rule, we have recognized exceptions, 'when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter.' " *Janusz,* 404 Md. at 537, 947 A.2d 560 (quoting *Dashiell,* 358 Md. at 100, 747 A.2d 600) (footnotes omitted).

In the instant case, the voluntary separation agreement of Ms. Hunsecker and Mr. Robinette reflects their mutual intent that Ms. Hunsecker was to be the alternate payee of Mr. Robinette's pension plan, that she was conveyed a fifty percent interest in the marital share of that plan, and that she would receive fifty percent of the marital benefits from the pension (including any death benefits) when payments began. Ms. Hunsecker and Mr. Robinette reached this agreement only after she transferred and assigned all her rights, title, and interest in the marital home, providing the proceeds of any sale would be the "sole and exclusive property" of Mr. Robinette. In addition, Ms. Hunsecker further conveyed all her rights, title, and interest in a boat and trailer the couple owned, and she released and discharged any claims for *pendente lite* and indefinite alimony.

As a consequence, we find no difficulty in holding that the evidence was sufficient for the trial court to conclude that a

constructive trust arose out of Mr. Robinette's failure to designate Ms. Hunsecker as his alternate payee irrespective of the parties failure to acquire a QDRO prior to Mr. Robinette's death. "It is enough that the 'conscience' of a court of equity would be traumatized if the legal title holder were allowed to deprive the beneficial owner of that which in good conscience belongs to the beneficial owner." *Hartsock, supra,* 21 Md. App. at 118, 318 A.2d 237 (quoting *Beatty, supra*). Accordingly, we affirm the circuit court's imposition of a constructive trust on the benefits already issued by the pension plan.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**